Motion to Dismiss.
BREAUX, C. J.
Defendant and appellee has moved to dismiss the appeal, urging as ground for dismissal that the bond is insufficient for a suspensive appeal.
The amount of the bond is $3,500.34, less than one-half over and above’ the amount of the judgment rendered. It should have exceeded the judgment by one-half.
*439 This question has been carefully considered recently. It was held that the rule “de minimis” did not have any application to appeal bonds. Pelletier v. State National Bank, 112 La. 563, 36 South. 592.
The suspensive appeal, therefore, is dismissed. The order of appeal was given in the alternative. The amount for the devolutive appeal was fixed at $225. The amount of the suspensive appeal bond exceeded that amount. The appeal is, therefore, good as a devolutive appeal.
The case is before us on a devolutive appeal.
The motion is, therefore, to the extent' that it includes a demand to dismiss the devolutive appeal, overruled.
On the Merits.
The defendant agreed to buy the sugar cane of plaintiff’s crop of 1895, which would be, it was stated, about 8,500 tons.
The contract was in writing. The defendant was the owner of a large central factory, and ground cane of his own and cane cultivated on farms and plantations other than his own. His mill for grinding the cane was a double six-roller mill. The daily capacity of the factory was large, and consisted of many tons — 30,000 in capacity in a season of 70 days.
The plaintiffs were to deliver the cane at defendant’s refinery.
The price agreed upon for the cane was 80 cents a ton for each cent of value that prime yellow clarified sugar would be worth in the New Orleans market. The cane juice not to be less than' 9 degrees sucrose.
Whenever over 12 there were to be added 4 cents to the price, and whenever it was less than 12 degrees then there was to be deducted 6 cents for each degree. Oane from which the juice showed less than 9 degrees sucrose was to be rejected. This contract provided that the cane was to be sufficiently matured to grind; to be topped in the first red joint, to be free of shucks and dust, and tbe frozen, soured, or damaged part off. The juice was to be daily subjected to thepolariseope test. If not satisfactory to plaintiffs, they reserved the right of resorting to a chemical test by any reliable chemist that plaintiffs might select, who would make-test with defendant’s chemist.
The quantity of cane to be delivered each day was to be prorated with the entire amount to be ground by defendant’s factory.
One hundred and ten tons were to be delivered by plaintiffs each day.
The succession of the late. Joseph H. Meeker, who died since this suit was tried in the-lower court, is represented by his daughter, Mrs. Drouet, as sole heir and universal legatee of her late father.
Defendant’s stoppages of refinery work, because of broken machinery, were not to continue over 7 days. The defendant was to-begin work on or about October 15th, and continue about 70 days, as before mentioned. Plaintiff’s complaint is that the late Joseph. H. Meeker, defendant, did not comply with this contract, and, in consequence, they lost 51 acres of cane, worth $3,500. In addition, plaintiffs set forth that they delivered to defendant at his refinery 596,555 tons of cane, worth $1,800; that, although the defendant had the right of rejecting all cane testing less than 9 per cent, sucrose, instead of rejecting the cane, if there was any of that test, he used it and converted it into-sugar.
There is very little law in the case. The-issues are nearly all of fact.
The case was tried before the judge ad hoc, the judge of the district court having recused himself.
The trial judge held, as to plaintiffs’ claim for $3,500 damages for lost cane, in substance, that the cane was not lost by defendant’s fpult, that the delay was due to* *440 plaintiffs’ shortage of labor, that plaintiffs continued to deliver cane after the asserted violation of the contract, and that they, -in consequence, were without right to recover for damages.
On the other branch — i. e., the claim involving the price for cane delivered — the court sustained plaintiffs’ demand to the amount of $1,193.11 and interest.
From this judgment, defendant prosecutes this appeal.
They (plaintiffs) met this appeal by answer in which they ask that the judgment be amended so as to allow the first item claimed by them for damages, viz., $3,500.
The managing agent of the plaintiffs, of their plantation known as the “May Place,” testified that he had the general superintendence of the planting and cultivating of the cane with the assistance of an overseer. He, during the grinding season, had charge of cutting down the cane and delivering it to defendant’s refinery. Here again he had an assistant manager to see to this work. He averred that one of the principal violations of the contract was that plaintiffs’ cane cars would be delivered' loaded and that they were not unloaded in time at the factory to enable plaintiffs to load them again and forward them to the factory in time to deliver the quantity of tons they agreed to deliver daily; that they could not deliver the quantity of tons per day unless the cars were promptly unloaded and permitted to return without great delay; that he at times had cane cut down in the field which he could not deliver as he had no empty cars. He says he complained of this to one of defendant’s representatives, in vain.
He saw an accumulation of cane at the refinery. The length of time it would take the refinery to work off the accumulation of cane he did not know, as he did not know the capacity of the mill nor the quantity of the cane in the yard.
This witness (manager of plaintiffs) states that after the killing freeze he wind-rowed plaintiffs’ cane, and left in the field not windrowed such a number of acres of cane as he thought he could cut down and deliver in 15 days. Fifty-one acres approximately is the number of windrowed and standing acres which he says were lost. Witness owned that he did not havé sufficient labor to have saved the cane lost, even if the empty cars had been promptly sent back from the refinery.
The answer at this point is: “Not entirely, no, sir; but I would have saved a great proportion of it.” And he further says: “Nearly three-fourths of it.”
This witness also states that there was delay in weighing the cars. There was some time a congestion of loaded cars on the track to the extent that it greatly impeded the movement of the cars. On cross-examination this witness admits that prior to the 15th of November labor on the May (plaintiffs’ ) plantation was short; that it was not sufficient to deliver 110 tons of cane a day. He could deliver only 60 or 70 tons.
After that he could deliver the 110 tons.
Other evidence shows that the quantity of cane lost was 40 or 50 acres. The witnesses for plaintiffs corroborate plaintiffs’ testimony on certain points and not on others. The assistant manager of the May plantation greatly differs in statement from the manager, and if his statement be correct it relieves defendant entirely from the charge of his delay in the work he had undertaken to do for plaintiffs. He (this assistant) states positively that up to the 1st of December, or about that date, plaintiffs did not have the labor to deliver over 70 or 75 tons per day, or thereabouts. With reference to the windrowing, the witness testifies:
“There were about 25 or 30 acres windrowed after being soured and unfit for use. There were also 60 acres of cane left standing in the field uncut, sour, and unfit to be ground. There *441 were about from 20 to 25 acres cut and hauled to the factory after it had been soured and unfit for use.”
This witness has made other statements regarding the work under the contract, which, if correct, render it impossible for plaintiffs to recover the damages claimed.
The attempt was made to prove that this witness was biased against plaintiffs. He was in plaintiffs’ employ until the end of the grinding and sugar making.
We do not think that he was absolutely discredited and' that his testimony is unworthy of belief. He is corroborated in many respects.
A Mr. Waddill, who had charge of the factory, as a witness said in substance that the tonnage of cane contracted for was not in excess of the ordinary capacity of the mill. He had before stated that the mill’s capacity was 30,000 tons in a season of 70 days, and that the amount of cane contracted for was about 25,000 tons, and 24,000 tons was the amount ground; that the stoppages were for the lack of cane; that the terminal facilities at the mill were good. And other testimony was given going to show that defendant’s refinery was up to date, and that the few stoppages did not interfere with the possibility of taking off plaintiffs’ crop, if, they had complied with their contract and delivered each day the number of tons they had engaged themselves to deliver.
The testimony is that the mill broke down, and in consequence there was at one time a delay of only four or five days, an occurrence and delay provided for in the contract; that there never was any congestion of cars at the mill amounting to anything.
We have followed the testimony of these witnesses, page after page, and have concluded with the district judge, in whose presence they testified, who heard them and had the oiJportunity to judge them, that the weight of the testimony is with the defendant as relates to damages.
The break in plaintiffs’ case for the $3,500 damages begins while their witnesses are testifying. It is made evident by their own witnesses that they were short of hands; that they did not for some weeks deliver the number of tons called for by the contract. True, some of these witnesses stated that defendant’s factory and refinery could not receive the number, even if plaintiffs had had them ready for delivery; but the assertions in this regard are fully met and rebutted by defendant’s witnesses. The delays, by these witnesses, are shown to have been delays for which defendant is not accountable. The result was that the killing freeze came and killed the cane, which was rejected as worthless. It had become sour and unfit for use.
A number of others sold their cane to defendant on about the same conditions. They lost no cane. This gives rise to a presumption that the forces on plaintiffs’ plantation were not proportionately as strong and active. There is nothing in the record to rebut that presumption.
The onus of proof was with plaintiffs. They have failed to sustain it by a preponderance of testimony. In such a case, the rejection of the demand made must follow.
This brings us to the second branch of plaintiffs’ case.
It is admitted by all parties that the amount of tons thus received and used was 500,555; i. e., tons of cane which defendant received, but which he declined to pay for after it had been made into sugar.
It will be recalled that the defendant retained the right, under the contract, to reject all cane testing less than 9 per cent, sucrose.
There was cane which did not so test. It fell slightly below the 9 per cent.
The defendant’s weak point here is that he received the cane and used it, even paid for *442 a portion of it. The juice it seems, was of two kinds. One seemed fair in quality as to purity of the juice and as to amount of sucrose. Another kind, we are told by the testimony, was inferior, having a low percentage of purity, a low percentage of sucrose, and toward the end of the grinding season it was frozen.
But we infer that all the cane received was not in such a frozen condition as to render the juice entirely useless. The test does not show it. Besides, this juice was received and manufactured into defendant’s sugar without notice of intended rejection. It was sold and a fair price obtained. It was too late to object at the time the defendant objected. The testimony does not satisfy us that it was not possible to have notified plaintiffs after the first unsatisfactory test. The juice, although it may have fallen slightly below 9 per cent, sucrose, had some value. It was used toward increasing the number of pounds made by defendant. Nothing shows that the quality of sugar from other cane than that of plaintiffs was damagingly affected after all juice mingled in the common juice tanks, nor .was it shown that the quality of the sugar was any less good because of the juice in question.
Plaintiffs’ chemist testified that he considered his experiment correct within one-tenth of 1 per cent, and that there is always liability of error, no matter who the chemist is. And the witness further says:
“Gilmore & Maginnis’ chemist and myself, when using the same process, obtained the same result, showing that the error made by either one of us was very slight indeed.”
In view of this admission, candidly made, and the fact that the difference between the 9 per cent.- sucrose and the degrees found by this chemist was slight, the cane having been received as before mentioned, the defendant should pay its value.
This chemist thought that the poor juice would prevent the better juice from crystallizing. There is no evidence that such was. the effect.
It was known that plaintiffs’ cane was frozen. The cane was ground, none the less. The juice from it must have had a period of rest in the juice tanks. This witness testified that he was instructed by the late Joseph H. Meeker to be careful and test all the cane that was ground for Gilmore & Maginnis; “that during the time that Gilmore & Maginnis’ cane was being ground no other cane was to be ground. In this way we obtained juice exclusively from Gilmore- & Maginnis’ cane.”
Prom this we are led to infer that the juice flowed into tanks separately from the juice of other cane, in which it was easy enough to call the attention of the sellers to. the inferiority of the juice. Nothing of the-kind was done.
If, on the other hand, the juice did not run into separate juice tanks, but became mixed from the time it left the mill, it does not appear that while it was going through the sugar making and refining .process these plaintiffs were ever informed that the juice had been found wanting in quality. They were never informed that the sugar obtained'' was of inferior quality. There is no evidence to show that the sugar was inferior in quality.
We are not to assume that such was the result and that the syrup had no value.
Having used this juice in process of manufacture into sugar of other juice from other cane, he must be held indebted for the percentage of value which it was found to have-relatively to the percentage of sucrose in other cane juice.
In a recent similar case this court held that, value was due. Lozes v. Segura Company. 52 La. Ann. 1844, 28 South. 249.
The attention of the court is called by able-counsel for defendant to the fact that defendant offered to prove by one of his witnesses. *443 that he had assisted in the preparation of the contract in question; that the clause “unfit for use,” regarding cane containing less than 9 per cent, sucrose, was inserted because it was understood by both parties to the contract that cane the juice of which tested under 9 per cent, sucrose was unfit for use.
The testimony offered was rejected by the court on the ground that it was an attempt to alter, vary, or change a written contract by parol.
Learned counsel in their brief place reliance upon the terms and conditions of the contract, and urge that in any case it is manifest that between the parties it was agreed that juice less than 9 per cent, sucrose was unfit for use.
It appears that defendant did use the juice. Prom this we are led to the conclusion that we are to interpret the contract as written, and that the term “unfit for use” is to be taken as sufficiently indicating the rights of the parties under the contract. Although the clause “unfit for use” is in the contract, we do not find it possible to agree with that view.
The parties inserted the words “unfit for use.” They are binding. But, the juice having been used, he was obliged to pay for it.
Besides we are not convinced that the juice was much less in value than 9 per cent.
We are informed by the testimony of the ■chemist in defendant’s employ that he made 15 tests of juice below the 9 per cent, sucrose and that 56 tests were made in which the percentage of sugar above 9 per cent.
Of these 15 tests below, he rejected 6.
Plaintiffs were paid without objection for 9 of these tests below 9 per cent, sucrose. Jt is not explained why they were paid for although defendant declined to pay for the other 6.
In paying as just stated, may it not be that plaintiffs were influenced to continue to deliver cane to defendant and that they did not seek to send it elsewhere to be used?
The value was fixed on the proportion in values as fixed in the contract Under the circumstances and the facts, we leave it at the amount fixed by the district court
It is ordered, adjudged, and decreed that the judgment is affirmed.